IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

JOSEPH  TERRY and     :
THERESA CRAPANZANO,    :
          :
 Plaintiffs,       :
          :   CIVIL ACTION
v.           :   NO. 2:13-CV-64-WCO
          :
YOUNG HARRIS COLLEGE,    :
          :
 Defendant.      :

## ORDER

The captioned case is before the court for consideration of defendant's motion for summary judgment [55].

## I. Factual Background[1]

Defendant Young Harris College ("YHC") is a private college operating an education program or activity receiving federal financial assistance. (Compl. ¶ 7.) On July 8, 2010, YHC sent plaintiff Joseph Terry ("Terry") a letter offering him an appointment to the faculty as assistant professor of Communication Studies. (Def.'s Undisputed Facts ¶ 10.)  The offer of appointment was extended to Terry contingent upon his completing all requirements for conferral of the terminal degree in his

---

[1]  These are undisputed facts culled from plaintiffs' complaint, defendant's statement of undisputed material facts ("Def.'s Undisputed Facts"), plaintiffs' response thereto, plaintiffs' statement of disputed material facts ("Pls.' Disputed Facts"), and various depositions and affidavits.

discipline by August 2, 2010.  (*Id.*)  The offer letter stated that if Terry did not complete all the requirements for his terminal degree by August 2, 2010, his appointment would be at the rank of instructor, he would not receive credit towards the probationary period for tenure until he completed his degree, and his salary would be reduced by $1,500 for the first year of service.  (*Id.* at ¶ 11.)  The offer letter stated, among other things, that in Terry's tenure track position, he was "an employee-at-will" and that his employment contract was subject to termination by either party to such contract at any time during its term.  (*Id.* at ¶ 13.)  On July 10, 2010, Terry accepted YHC's offer of employment by signing the offer letter.  (*Id.* at ¶ 14.)

On August 2, 2010, Terry signed an agreement to abide by the rules, policies, and standards set forth in the YHC Employee Handbook (the "Handbook").  (*Id.* at ¶ 15.)  The Handbook contains, among other things, a provision that states in pertinent part:  "It is not possible to list all the forms of conduct that are considered unacceptable in the workplace, but the following are examples of infractions that may result in disciplinary action, up to and including termination of employment: . . . Insubordination, including, but not limited to, failure or refusal to obey the orders or instructions of any Supervisor or Manager, or the use of abusive or threatening language toward any Supervisor or Manager."  (*Id.* at ¶ 31.)

Terry did not obtain his Ph.D. by August 2, 2010.  He did not obtain his Ph.D. by the end of the 2010-11 academic year.  (*Id.* at ¶ 16.)   YHC sent Terry a reappointment letter on June 24, 2011, that contained the same terms as his July 8, 2010, appointment letter, except that it added "[i]f you have not completed the requirements for [Ph.D.] by December 1, 2011, [YHC] will reevaluate whether it will renew your appointment for the academic year 2012-2013.  If [YHC] decides not to renew your appointment, you will be so informed by December 15, 2011."  (*Id.* at ¶ 17.)   On June 30, 2011, Terry accepted the reappointment offer by signing the reappointment letter.  (*Id.* at ¶ 19.)

On August 30, 2010, YHC's campus newspaper, the *Enotah Echoes*, published an article accusing one of YHC's students of rape where no police report had been filed regarding the rape and where the allegations proved to be unsubstantiated.  The newspaper's faculty advisor at the time the article was published was Nick Bowman ("Bowman").  (*Id.* at ¶ 20.)  YHC was greatly concerned about the potential liability that the article created not only for YHC but also for the faculty and students involved in its publication.  (*Id.* at ¶ 22.)  Bowman resigned his position at the end of the 2010-11 academic year, and YHC conducted a last-minute search for his replacement.  The search failed to produce a suitable replacement.  (*Id.* at ¶ 23.)

Upon learning that the search for Bowman's successor had been unsuccessful, Terry proposed that YHC interview Theresa Crapanzano ("Crapanzano") for the position. Crapanzano, Terry's live-in partner, was working on her Ph.D. in communication. (*Id.* at ¶ 24.) Crapanzano was interviewed, and after a discussion of the potential conflicts relating to her relationship with Terry, YHC decided to hire her as a non-tenure track instructor for one academic year. (*Id.* at ¶ 25.) YHC sent Crapanzano a letter on June 20, 2011, offering her a non-tenure track appointment for the 2011-12 academic year to the YHC faculty as a visiting instructor of Communication Studies beginning on August 1, 2011. (*Id.* at ¶ 26.)

Crapanzano's offer letter stated that although her appointment would be for the academic year only, she would be paid over a 12-month period unless she specified otherwise and that she was eligible for fringe benefits provided by YHC. (*Id.* at ¶ 27.) Crapanzano's offer letter stated that in her non-tenure track position, she was "an employee-at-will" and that her employment was subject to termination by either party to such contract at any time during its term. (*Id.* at ¶ 28.) Crapanzano accepted the offer of employment on June 30, 2011, by signing YHC's offer letter. (*Id.* at ¶ 29.) On August 3, 2011, Crapanzano signed an agreement to abide by the rules, policies, and standards set forth in the Handbook. (*Id.* at ¶ 30.)

4

In the fall of 2011, Ronald Roach ("Roach"), Vice President for Academic Affairs, assembled an ad hoc committee that consisted of Cathy Cox ("Cox"), President of YHC; Ruth Looper ("Looper"), Dean of the Division of Humanities; Joy Goldsmith ("Goldsmith"), Associate Professor of Communication Studies; Denise Cook, Director of Communications and Marketing; Krystin Dean, Assistant Director of Communications and Marketing; Crapanzano; and himself to develop a media policy specifically applicable to the *Enotah Echoes* (the "Media Policy") and to select a media advisory board (the "Board") to provide advice with regard to the newspaper. (*Id.* at ¶ 36.) The ad hoc committee met regularly throughout the fall semester of 2011 for the purpose of developing the Media Policy and selecting the members of the Board. (*Id.* at ¶ 37.)

The members selected for the Board were Jennifer Hallett ("Hallett"), Associate Professor of Communication Studies; Jennifer Hughes, Assistant Professor of English; Drew Cavin, Assistant Professor of Outdoor Leadership; Rouseline Emmanuel, Director of Campus Activities; Mary Beth Maxwell, student government association representative; and Eden Doniger ("Doniger"), an attorney specializing in First Amendment and media law. (*Id.* at ¶ 41.) With input from Terry, Crapanzano drafted the section of the Media Policy entitled "Standard Three - Liability," which reads in pertinent part:

> In acknowledgment of [YHC's] potential legal liabilities as a private college in publishing the student newspaper, the Communication Studies Department is expected to encourage adherence to professional, ethical, and legal journalistic standards. . . . . [A] list of articles set for publication will be distributed to all non-administrative, full-time Communication Studies faculty members and the Dean of the Division of Humanities in a timely fashion prior to publication. The above faculty members, individually or collectively, at their discretion, may compel the newspaper to seek legal guidance and/or request copies of articles for review prior to publication. As the faculty members are not legal experts and the newspaper is a student-run publication, this step is solely intended to help improve professional standards of practice, increase transparency, and identify potential issues of liability that may require consultation with a College-designated attorney.

(*Id.* at ¶¶ 43-4.)  The Media Policy and the Board were put into place at the end of the fall semester in 2011.  (*Id.* at ¶ 45.)  Because the Media Policy and the composition of the Board were not finalized until the end of the fall semester, no issue of the *Enotah Echoes* was published during that semester.  (*Id.* at ¶ 46.)

In November 2011, Roach asked Goldsmith as Chair of Communication Studies to confirm that Terry would be receiving his Ph.D. by December 1, 2011, as stated in his reappointment letter.  (*Id.* at ¶ 63.)  On November 27, 2011, Goldsmith emailed Terry to inquire as to the status of his dissertation.  (*Id.* at ¶ 64.)  In a November 27, 2011 email, Terry responded to Goldsmith's inquiry as to the status of his dissertation, stating in pertinent part:  "At this point, I expect to finish my remaining writing over the semester break . . . . My plan is to defend before my next annual review, so as to make it a non-issue.  That will mean graduating in May."  (*Id.* at ¶ 65.)

6

When Hallett became Chair of Communication Studies on January 1, 2012, the first thing Roach asked her to do was to confirm that Terry would be obtaining his Ph.D. in May 2012.  (*Id.* at ¶ 67.)  Hallett met with Terry in early January 2012, and he confirmed to her that he would be receiving his Ph.D. in May 2012.  She told Terry that would be fine.  (*Id.* at ¶ 68.)

In late January 2012, pursuant to the Media Policy, Hallett requested that Crapanzano provide to Doniger a copy of an article that was to be published in the upcoming issue of the newspaper, which was the first issue to be published after the Media Policy took effect.  (*Id.* at ¶ 47.)  Crapanzano published the article without providing a copy to the attorney as Hallett requested.  (*Id.* at ¶ 50.)  Because Hallett was new in the position of Chair of Communication Studies, having been appointed only on January 1, 2012, after Goldsmith's resignation, she was unsure as to what disciplinary action to take against Crapanzano.  As a result, she took none.  (*Id.* at ¶ 51.)

In January 2012, Hallett learned that Crapanzano had been arguing with Kevin Marinelli ("Marinelli"), Assistant Professor of Communication Studies, putting pressure on him to change the syllabus and assignments in one of his courses because she disagreed with how he was conducting his class.  She also encouraged students to complain to Hallett about Marinelli.  (*Id.* at ¶ 52.)  In a Communication Studies

department meeting in late January 2012, Hallett told Crapanzano and Terry that she had found Marinelli's course to be appropriate, that she wanted both of them to indicate to students that the course was appropriate and that they needed to do their course work, and that she wanted both of them to stop interfering with Marinelli's academic freedom.  (*Id.* at ¶ 53.)  Students told Hallett that despite her instructions Crapanzano and Terry continued to encourage them to go above Hallett's head to the dean of the division and to essentially boycott Marinelli's course.  (*Id.* at ¶ 54.)  Despite Crapanzano and Terry's refusal to follow her instructions with regard to Marinelli and Terry's comments about Hallett, which she found "very insulting," Hallett again took no disciplinary action against either Crapanzano or Terry.  (*Id.* at ¶ 31.)

On or about February 16, 2012, plaintiff Jo Hannah Burch ("Burch") was accepted as a pledge by Gamma Psi sorority at YHC.[2]  (Compl. ¶ 9.)  Upon being accepted as a pledge by Gamma Psi, Burch was subjected to five nights of hazing as a precondition to membership in Gamma Psi.  On or about March 18, 2012, Burch decided to de-pledge from the sorority.  She informed Gamma Psi's vice president of her decision to de-pledge.  (*Id.* at ¶ 17.)  That same day, Burch met with Crapanzano, who at that time was Burch's advisor on the school newspaper, and disclosed her

---

[2]  Burch enrolled as a full time undergraduate student in August 2011.  (Compl. ¶ 4.)

hazing experience.  (*Id.* at ¶ 18.)  Burch informed Crapanzano that she was harassed for five nights during the pledge, including being called a "bitch" by female sorority members and a "stupid bitch" by a male participating in the hazing and being asked repeatedly, "What's my fucking name?"

Upon learning of Burch's hazing, Crapanzano began to further investigate allegations of hazing at YHC.  Her investigation included interviewing a number of students, surveying faculty members regarding reports of hazing they had received, and obtaining copies of online exchanges among sorority members.  (*Id.* at ¶ 29.) Through her investigation, Crapanzano states that she uncovered sexually degrading conduct associated with hazing.  (*Id.* at ¶ 30.)

On or about March 19, 2012, Burch met with Susan Rogers ("Rogers"), Vice President of Student Development, and Lynne Grady ("Grady"), Director of Counseling Services, to report that she had been subjected to hazing.  (Def.'s Undisputed Facts ¶ 69.)  At the meeting, Rogers provided Burch with a copy of a pamphlet on her rights under Title IX and several pages from the YHC's Guide to Student Life regarding sexual harassment and procedures for filing a complaint with YHC.  (*Id.* at ¶ 70.)  After the meeting, with permission from Burch, Rogers called Burch's mother and assured her that she was taking her daughter's complaint seriously.  (*Id.* at ¶ 72.)  Rogers also called Cox to notify her that she had received a

report of possible hazing and would follow up with her when she had more information. (*Id.* at ¶ 73.) The next day, Rogers met with Cox, gave her a copy of Burch's statements, described what Burch had told her, told Cox she believed Burch, and stated that she expected Burch's complaint would result in the suspension of Gamma Psi sorority. (*Id.* at ¶ 74.)

Immediately prior to spring break, Rogers and Grady met with Burch to determine how Burch wanted to proceed with her complaint. (*Id.* at ¶ 75.) On April 2, 2012, Rogers and Grady again met with Burch, who was accompanied by Goldsmith and Terry. At that meeting, it was alleged that a YHC staff member had been involved in Burch's hazing. (*Id.* at ¶ 76.) That evening, at Rogers' request, Rogers and Grady met with Cox; Roach; Jay Stroman, the Vice President for Advancement; Clint Hobbs ("Hobbs"), the Vice President for Enrollment Management; and Ken Henderson ("Henderson"), the Campus Police Chief, to inform them of the earlier meeting, the accusation that a staff member had been involved in the hazing, and the decision Cox and she had reached to suspend Gamma Psi for one year. (*Id.* at ¶ 80.)

After the meeting, that same evening, Rogers met with the Gamma Psi sorority members, delivered the letter of suspension, laid out the terms of the suspension, and explained that violation of the suspension would result in permanent loss of

recognition for the sorority as a college organization. (*Id.* at ¶ 82.) Because it was not Rogers' responsibility to investigate YHC employees, Cox assigned Hobbs to investigate the allegations of the involvement of a staff member in Burch's hazing. Hobbs conducted an investigation and found no evidence to support Burch's allegation. (*Id.* at ¶ 84.)

On April 4, 2012, Hallett sent an email to Crapanzano stating, among other things:

> I just got wind of the hazing incident and likely story in the paper. Yikes! It was only a matter of time before something like that happened (and that it was publicized). I just want you to know that you have my full support in moving forward. I also want you to know that Cathy is fully aware of the likelihood and even merit of running the story and has no opposition to it. I know. . . but I'm taking it at face value! . . . I'm glad we have the retainer agreement with [Doniger] - she can vet the story for legal stuff so the reporter can make a well-informed decision about whether names and other identifying information should be included if someone is being accused of a federal crime. Yikes! Have you contacted her yet? If not, may I humbly ask that you do before the edition goes to print? Humbly . . . very humbly.

(*Id.* at ¶ 85.)

On April 17, 2012, Goldsmith, Crapanzano, and Associate Professor of English Amanda Lawrence conducted a faculty forum to discuss hazing at YHC and, specifically, YHC's failure to impose penalties on individuals for hazing violations. (*Id.* at ¶ 87.) The YHC's Guide to Student Life contains a policy prohibiting hazing that reads in pertinent part: "[YHC] strictly prohibits hazing of any kind. Student

Organizations as a whole and/or individual members of any student organization will be held accountable for violations of federal, state, and local law and the [YHC] policy as it relates to hazing." (*Id.* at ¶ 88.) Goldsmith requested that the administration and staff of YHC not attend the faculty forum or participate in the discussions that followed it, and no administrative employees or staff member of YHC attended. (*Id.* at ¶ 89.) While defendant asserts that the discussion at the meeting centered on hazing and individual liability for hazing and not on the specific nature of any particular hazing incident, plaintiffs argue that the sexual nature of the hazing was heavily discussed.

In connection with the faculty forum, a petition was circulated and signed by 36 faculty members, including Hallett and Looper, that read: "We request that [YHC] revise its hazing policy to require repercussions for individuals who participate in hazing. This change would bring [YHC] in accordance with Georgia hazing law. We, the undersigned faculty believe that changing the pervasive and destructive culture of hazing on the YHC campus will occur only if the institution holds individuals accountable for their illegal and unethical acts." (*Id.* at ¶ 90.) YHC's hazing policy already required repercussions for those who were proved to have participated in hazing. (*Id.* at ¶ 91.) The petition circulated and signed in connection with the faculty forum was never provided to YHC's administration. (*Id.* at ¶ 92.)

On April 18, 2012, Hallett sent an email to Looper stating: "[W]e left it that Theresa felt no reason to have [Doniger] review [the hazing story] but planned to send it to comm faculty and you for our review.  Given the specific reference to admissions staff involvement (despite not having a name) I think maybe we should push for the review by [Doniger] regardless.  Theresa does not respond well to directives from me, so I am hoping to enlist your help in this. . . .  One of her concerns about [Doniger] was the money, which I know is not a concern for Ron or Cathy.  The second concern was setting a precedent for sending her things that didn't need to be sent.  In Ron's words, if there was ever a story needed to be sent to [Doniger], this is it." (*Id.* at ¶¶ 120-21.)

On April 22, 2012, YHC held its annual honors ceremony at which outstanding students were recognized for their achievements.  (Def.'s Undisputed Facts ¶ 111.) Family and friends of the students being honored were invited to the honors ceremony.  (*Id.* at ¶ 112.)   At the honors ceremony, Crapanzano presented the Communication Studies service award to two students who had worked on the newspaper.  (*Id.* at ¶ 113.)  In her presentation, Crapanzano stated:

> This has been a trying year for the newspaper, and, by extension the Communication Studies Department.  After a semester of uncertainty and a mandated suspension of publication, we entered this semester with a devastated staff.  We lost more than half our editors and countless other reporters, writers, photographers, and designers.  Yet both Annie and Kathleen [the students being honored] began the semester with

13

excitement, working to recruit new members and encourage old ones to stay.  As we went to press on our first issue, Annie and Kathleen almost singlehandedly laid out and edited the entire issue, staying many nights until 4 am to edit stories and train new writers.  They did this not for personal gain, but because they both firmly believe in the necessity of the *Enotah Echoes* on campus, as a forum for student voices and an avenue to speak truth to power.  In honor of the important role their dedication played in preserving a vital part of the Communication Studies curriculum, the Department would like to recognize them with this award.

(Pls.' Resp. to Def.'s Undisputed Facts ¶114.)

On April 23, 2012, Hallett, as Chair of the Communication Studies, sent an email to Cox stating:  "The awards are about the successes of the students and to the extent that anything else was communicated, I apologize.  I'm trying to be diplomatic here, but I'd welcome a more candid conversation with you at your convenience." (Def.'s Undisputed Facts ¶119.)  Hallett and others at YHC believed that because plaintiff had mentioned the words "mandated suspension" in connection with the newspaper and the words "speak truth to power," Crapanzano was using the awards ceremony as a platform to condemn the administration.  Cox said that she "wanted to lean over [to Roach] and ask if [they] could fire [Crapanzano] on the spot."  (Pls.' Disputed Facts ¶ 19.)

On April 23, 2012 and April 24, 2012, respectively, Hallett and Looper emailed Crapanzano asking for a list of articles pursuant to the Media Policy.  (Def.'s Undisputed Facts ¶ 122.)  In an email dated April 24, 2012, to Terry, Goldsmith,

14

Marinelli, Hallett, and Looper, Crapanzano stated that they were "talking about publishing tomorrow" and that they had "created a tentative list last night (which will be finalized this afternoon) which we will distribute after we finalize." (*Id.* at ¶ 123.) On April 24, 2012, in another email to the entire Communication Studies faculty, Looper told Crapanzano: "[W]e need the list of stories and the hazing article (to be written this afternoon, as I now take it) as soon as possible so that we can review them. I want us to follow the policy carefully, so I'm copying the entire Comm. Studies department because we should all receive the list of articles and the hazing article for review and discussion." (*Id.* at ¶ 124.) Crapanzano refused to submit the article to Doniger as Hallett had requested, claiming that Hallett was misinterpreting the policy. (*Id.* at ¶ 127.) In her April 24, 2012 email, Crapanzano stated further that the focus of the article had changed from focusing on the individual she had accused of hazing and that "this article does not reference employees being involved with hazing or even individual names, with the exception of those interviewed. In no way does this article pose any sort of a libel threat . . . I don't want to see our department bend to fear from the administration." (*Id.* at ¶ 129.)

Hallett responded to Crapanzano's email again asking that she submit the hazing article to [Doniger] and stating, among other things:

> It would appear that there is little need for concern over libel. However,
> I think that the best option for both the newspaper staff and faculty is to

follow the policy to the letter.  Because I am not an expert in libel, I personally would like to request that the article regarding the Greek organizations who have been reprimanded for hazing go to Eden Doniger.  This is good precedent to set in that it shows that the policy is doing its job, which is to protect everyone (paper, faculty, admin) from legal issues. . . .  Even if we don't need protection because the story is innocuous, there is still no harm in getting that opinion seconded by the person whose job it is to give such an opinion.  Eden is our ally, and getting her input is a good thing.  We're setting the wheels in motion of the policy crafted with so much effort and turmoil last semester.  Let's use it to our best advantage.

(*Id.* at ¶¶ 130-31.)  Crapanzano responded to Hallett's email the same morning, again refusing to give the article to Doniger and stating, among other things:

I honestly don't know how to respond to this.  This is not the spirit of the policy at all (speaking as someone who did craft the policy with turmoil and effort last semester) and also is not to the letter of the policy.  You haven't even read the article or discussed it fully, but you are requesting it to go Eden, Jen? . . . .  I feel like a mathematician who has a chair asking her to check with someone else regarding whether 2+2 really equals 4. . . .  Technically speaking, Eden is not our 'ally'.  She is the school's attorney and while I believe and hope she will be an impartial judge and expert, she is being wielded by the administration right now.

(*Id.* at ¶¶ 132-33.)

Looper, who had been copied on Crapanzano's response to Hallett, emailed Crapanzano on April 24, 2012, stating that Crapanzano and she had met the previous Friday and that Crapanzano had agreed to follow the policy because the Communication Studies faculty would be fulfilling its designated role, and the Vice President for Academic Affairs and the President "would not be involved with the

review of the list and any subsequent action." (*Id.* at ¶ 134.) Looper's email requested that a list of articles and a copy of the "entire article on hazing" be sent to all Communication Studies faculty for review, adding:

> [W]e would all be violating the policy if we do not have time to receive and review the list of articles and then request legal guidance, if deemed necessary. . . . [W]e're not setting a dangerous precedent by actually following the policy. . . . Please help me enact the guidelines that we hammered out last term. I truly believe that following these steps will best serve our students and the department and division. Yes, I'm under scrutiny about the newspaper, but I have been and shall be under much more pressure from upper administration about other matters. Please believe me when I say that I have given this matter a great deal of thought, and I'm requesting that we follow the policy because I believe it's the right course for students and faculty, not because of external pressure. I give you my word on this.

(*Id.* at ¶¶ 135-36.)

Crapanzano replied to Looper's April 24, 2012 email, stating that she was still working on the final issue, was working with the editors to put the story list together, and could not predict when the stories would be done as some of their sources for the article were not getting back to them quickly, including members of the administration. (Pls.' Resp. to Def.'s Undisputed Facts ¶137.) In the same email, Crapanzano also stated:

> I was very disturbed by Jen's insistence that we send a story to a lawyer without actually seeing it or fully processing my description of it. Given the manner in which I described the article, it would be completely irrational to think there was any reason to send the article to a lawyer, which makes me feel that (1) Jen isn't listening and (2) her concern

17

about the article and her impetus for compelling us to seek guidance from Eden had nothing to do with actual legal concerns, but from pressure she's receiving directly from Cathy, etc. . . . . Just as I feel the administration was trying to wield Eden as a tool, I feel the administration is now trying to wield the faculty as a tool. This is very disturbing to me and, while it might be allowable by the policy, it is firmly not in the spirit of the policy. . . . . [T]hat part of the policy was inserted later (by me) because I thought it would be politically wise to show that I wasn't a rogue advisor (like Nick was at times). . . . It was not intended to create an opening for faculty (specifically, the chair) to micromanage or demand things in an unprofessional manner. At the beginning of this semester, I met with Ron and we were discussing the policy (Jen was present at this meeting) and he specifically brought up that he thought that part of the policy should be phased out and eliminated at the end of the year because it wasn't necessary and because it increased liability for the College. Again, when I wrote that part of the policy, I expected that it would not be abused. While Jen is technically allowed to compel me to consult with a lawyer if she truly has legitimate, founded rationale, I don't feel that is the case now. Jen openly writes in her email that she doesn't think the story puts us at risk, but Eden will "confirm what we already know" and somehow prove to the administration that we are doing a good job. That is a political use of the policy and not a protecting the College, department etc. from lawsuit use of the policy. That is why I am so fundamentally opposed to her request. Intent matters a great deal and, just as we should follow policy, we also shouldn't misuse policy and twist the meaning to suit different goals, which Jen has done on multiple occasions. This is a truly dangerous precedent.

(*Id.* at ¶¶138-140.)

On April 25, 2012, at a regularly-scheduled faculty meeting, Cox was invited by Roach to speak to the faculty on YHC's hazing policy and its enforcement. (Def.'s Undisputed Facts ¶ 101.) Cox was accompanied to the faculty meeting by Rogers and Henderson. (*Id.* at ¶ 102.) At the meeting, Cox described the process YHC had

followed in taking action against Gamma Psi sorority and then took questions from the faculty. (*Id.* at ¶ 103.) Cox, who is a lawyer, sought to explain to the faculty, who were non-lawyers, the standards of proof applicable to allegations against any individual accused of having participated in hazing and the reasons for YHC's decision not to take action against individuals, including an employee accused of participating in Burch's hazing. (*Id.* at ¶ 104.)

Crapanzano responded to Cox's explanation by shaking her head. (*Id.* at ¶ 105.) Cox then replied that Crapanzano could "shake her head all day long." (Faculty Meeting Excerpt 3-4.) After further discussion of the hazing incident, Crapanzano said that she knew "a lot of stuff about the case." Cox responded: "Well, that's fine, we can step outside and fight about it all day." (*Id.*) Several minutes after her exchange with Cox, Crapanzano got up and walked out of the meeting. (Def.'s Undisputed Facts ¶ 109.) Crapanzano felt that Cox had singled her out and argued with her in front of a large crowd of her colleagues. She interpreted Cox's final statement as an angry outburst and felt threatened. (Pls.' Disputed Facts ¶22; Dep. of Crapanzano 56.)

Also on April 25, 2012, Looper replied to Crapanzano's April 24, 2012 email by stating that Hallett's actions told her that "she, too, is dedicated to our students and to sound academic practice." (Def.'s Undisputed Facts ¶ 143.) Looper further stated:

"As I wrote yesterday, I give you my word that I request that we follow the policy because it's my job to think of the short-term and long-term welfare of the students and faculty of the Humanities Division, not because I'm allowing myself to be wielded as a tool of the administration . . . . I know that you want to be ethical and transparent, Theresa.  I do as well."  (*Id.* at ¶¶ 143-44.)

On Thursday, April 26, 2012, the day before final exams began at YHC, Crapanzano sent an email to Looper and the Communication Studies faculty that stated:  "This is our tentative (although close to final story list). . . . [W]e don't have the Greek stories done yet."  (*Id.* at ¶ 145.)  Crapanzano stated that they were planning to publish on Monday or Tuesday depending on the need to speak with Doniger, adding "I know the Greek stories will be the main concern and I will let you know when I have those in and edited."  (*Id.* at ¶ 146.)

The next day, April 27, 2012, the first day of final exams, Crapanzano emailed the same Communication Studies faculty along with Cox and Roach, stating:

> [I am] writing to you all to note my disagreement with the manner in which the liability section of the media policy is being enacted within the Communication Studies department.  I am committed to abiding by our current policy.  However, it has been requested of me that I directly send an article to Eden Doniger by Dr. Jen Hallett and I don't believe this request is in line with the policy. . . . While any faculty member has the right to request an article for review by a lawyer, the policy clearly states that request must be predicated on concern about the potential liability for the newspaper.  Based on a number of emails between Dr. Hallett, myself, and the faculty, I strongly believe her request is predicated on

other factors. . . . Ethically, I will not honor any requests from faculty that are based on a misuse or twisting of the policy.

(*Id.* at ¶¶ 147-48.)  On the evening of April 27, 2012, Cox sent an email to Roach,

Looper, and Hallett stating:

> I cannot begin to tell you how outrageous I find [Crapanzano's] message. If there is nothing to hide, then this faculty member should welcome review by the lawyer the college has made available to the newspaper - to protect the college, to protect the students, and to protect Ms. Crapanzano personally - because all of these have exposure if any article is libelous or otherwise defamatory. . . .  I have long since lost my patience with her efforts to grandstand, and her lack of judgment and childish behavior (Wednesday faculty meeting) demonstrate no reason whatsoever to trust her judgment here. . . . Please get this situation under control.  If hazing articles are not reviewed by the lawyer - and all other articles that could present legal issues - then I personally will pull the plug on the newspaper.  She is playing each and every one of you, and it is shameful.

(Dep. of Cox Ex. 14.)

Earlier on April 27, 2012, Hallett had emailed the other members of the Board to ask for advice on how to respond to the situation with the publication of the newspaper, stating:  "The most recent timeline we've been given is that the article will be written by Saturday, meaning that it won't go to our legal counsel (Eden Doniger) until Monday for her review.  This means that in the best case scenario, the paper wouldn't be published/distributed until Tuesday. . . .  I seek your advice on what to do in terms of professional conduct as well as 'well-being'"  (Def.'s Undisputed Facts

¶ 151.)  On the evening of April 27, 2012, Hallett emailed Cox, Roach, and Looper

to let them have the feedback she had received from the Board members, stating:

> In sum, the Board (and especially Eden) feels that the College is better
> served by advising the paper that they have missed their window for this
> story, at least for this edition.  As far as to whether to let the rest of the
> paper to be published, quite frankly I feel that disallowing one article
> would probably be met with more contention than pulling the plug
> completely.  Certainly pulling the plug completely ends this and lets us
> all get back to work on things that need our attention at this time of year.
> . . . Cathy, I agree that all of us have been dubbed "the bad guys" despite
> my attempts over many days to be flexible and accommodating.  The
> time for that is over, and I personally am tired of trying to reason with
> someone who is not able to be reasonable on the topic of legal counsel
> and what it means to follow the policy that is currently in place.  Having
> lost my rose-colored glasses, Jen.

(*Id.* at ¶¶ 152-53.)

On April 28, 2012, after the semester had ended and final exams had begun,

Hallett emailed Crapanzano with copies to Cox, Roach, Looper, the Communication

Studies faculty, and the Board stating:

> [C]iting failure to fulfill the paper's obligation to seek timely legal
> review when compelled to do so by a full-time Communication Studies
> faculty member combined with the lack of an appropriate deadline for
> timely publication during the semester, the President has determined that
> the paper has missed the window for publication this semester and will
> not publish another issue this term, either in print or on line. . . .  The
> President's decision was not made lightly.  She received input from the
> Vice President for Academic Affairs, Media Advisory Board members,
> and myself as the Communication Studies Department Chair.  Also, she
> was made aware of ongoing conversations between the Dean of
> Humanities and me about the need to follow the approved policy.  We
> all agree that it is regrettable that the students were not afforded more

> opportunity to express themselves in their newspaper this semester.  It
> is the goal of the Department and the Administration to ensure that next
> year's newspaper students will have those opportunities.

(*Id.* at ¶¶ 154-55.)

In an April 29, 2012 email to Hallett with copies to Cox, Roach, Looper, the

Communication Studies faculty, and the Board, Crapanzano stated that she found it

a direct infringement on her rights as a professor to dictate whether or not the window

of publication had passed.  She also claimed that the concern about publishing during

finals week was brought to her attention only the previous week and was never raised

as a policy to her before that time.  (*Id.* at ¶ 156.)  The two previous newspaper

advisors, Bowman and Louisa Franklin, had each published at least four issues of the

newspaper every semester and had never required or allowed students to work on the

newspaper less than two days prior to finals.  (*Id.* at ¶ 157.)

Cox emailed Hallett and Roach with regard to Crapanzano's April 29, 2012

email:

> If I've ever seen a more insubordinate message, I sure can't remember
> when, and I hope that you will not allow this message to stand
> uncorrected or unchallenged.  Nor should she be allowed to bully her
> Department Chair this way.  Without question, Jen had every right to
> request to read or seek legal review of a story any time for ANY reason.
> Nothing in the policy says - or should say - that the "motive" for reading
> or seeking legal review of an article has to be tested.  That is beyond
> preposterous! . . . . And there is not one thing wrong with reading and
> seeking legal review of an article because of political or liability
> concerns - reading and reviewing it does not mean it will be censored or

changed, and Jen, you have every right to do this.  I will respond to this
if you think I should - otherwise, I will look to you for the best response.
Thanks, Cathy.  P.S. Can we remove her from the faculty before
Commencement?

(*Id.* at ¶¶ 158-59.)

On April 29, 2012, following Cox's email, Roach emailed Crapanzano, with

copies to Hallett, Looper, the Communication Studies faculty, and the Board:

> [T]he policy could not be more clear that a member of the department
> faculty or the division dean may compel an article to be reviewed by
> counsel.  There is no requirement that the person making the request
> must explain his or her motives for the request nor do such motives have
> to meet with your approval.  In spite of that, Dr. Hallett explained clearly
> that she had excellent and rational reasons for requesting the review in
> order to ensure legal protection for all parties involved, a goal that you
> as faculty advisor should have supported for the sake of the newspaper
> and its student staff.  Moreover, Dr. Hallett's request was also supported
> by Dean Looper. . . .  Dr. Hallett made this request many days ago.  She,
> Dean Looper, and the administration showed great patience in waiting
> until the last possible moment before making this decision, which for the
> sake of the students we did not want to have to make.  At the request of
> Dr. Hallett and Dr. Looper, we gave them every possible moment to
> communicate with you and resolve this matter. . . .  Unfortunately, your
> continuing refusal to comply with Dr. Hallett's legitimate request
> delayed the process so long that we had no choice but to cancel the issue.
> Further, I consider your statements about Dr. Hallett in your email to be
> completely inappropriate.  There is no room for further debate on this
> matter.  Nor will I discuss it further by email.  Any future discussion will
> take place face to face with appropriate personnel.

(*Id.* at ¶¶ 161-62.)

The response to Roach's email came not from Crapanzano but from Terry,

whose April 30, 2012 email states, among other things: "Hi, all (except Ron, who is

24

apparently done with email), Ron's reading of the policy is mistaken and ignores all context of the policy as written and the entire reason the policy was created in the first place - YHC's legal liability as publisher of a student - edited newspaper. . . .  To act as if the 'policy could not be more clear,' according to Ron's decontextualized reading, is disrespectful to me and all other faculty who actually co-wrote this policy during the fall semester.  It's not only disrespectful, it's astonishingly unethical." (*Id.* at ¶¶ 163-64.)

In an earlier September 14, 2011 email to adjunct professor John Sugg regarding the proposed Media Policy, Terry wrote:

> I strongly agree with [Crapanzano]'s idea to have a list of stories . . . given to the comm studies faculty for review.  That's not prior restraint - we're not censoring to censor. . . .  Because the student newspaper is part of our academic curriculum (i.e., the college provides the funding) at a private college, Cathy Cox and the administration are essentially the publishers and can legally practice prior restraint/review/whatever, so prior review by our faculty is much preferred . . . . I think it's implicit that the advisor will still be the point person and be reading articles for legal concerns, but at least providing an overview of articles to our faculty might help to calm fears of the administration about having too much power vested in one person - the advisor.  At this point the administration seems to think the advisor will do whatever he or she wants and that there will be no transparency.  I think this policy provides some. . . .  Finally, our goal as faculty will be to possibly identify articles that perhaps a lawyer might need to look over to protect the newspaper and thereby the College - it's not saying we're simply going to axe articles.  I agree the policy is not 100% fool proof, but I don't see that as possible.  This policy only provides an extra level of protection.

(*Id.* at ¶¶ 165-67.)

In response to Terry's April 30, 2012 message calling Roach "disrespectful" and "astonishingly unethical," Keith DeFoor ("DeFoor"), Associate Vice President for Academic Affairs; Vince Robelotto ("Robelotto"), Vice President for Human Resources; Hallett; Looper; and Roach met on May 1, 2012, to discuss wether Terry should receive a disciplinary warning called a Corrective Action.  (*Id.* at ¶ 168.) Roach asked DeFoor to attend as he was recusing himself from the decision-making because he had been the target of Terry's email.  (*Id.* at ¶ 169.)  DeFoor, Looper, and Hallett all agreed that Terry's email was insubordinate and warranted Corrective Action.  (*Id.* at ¶ 170.)

The discussion then turned to the fact that Terry was not going to receive his Ph.D. in May 2012 as he had represented.  (*Id.* at ¶ 171.)  Although Terry had included a statement in the self evaluation he had submitted in March 2012 saying that he was going to be obtaining his Ph.D. in August 2012, he did not copy Hallett on the document, and she found out about the change for the first time at this meeting.  (*Id.* at ¶ 172.)  Hallett had submitted a draft evaluation of Terry to DeFoor on April 10, 2012, that stated:  "In scholarship, I am concerned.  I know Joe is engaged in projects outside of his dissertation, but until that is finished I can't rate him as meeting expectations in this criterion yet.  When [we] last talked, he planned to defend in May."  (*Id.* at ¶ 173.)  Looper submitted her evaluation of Terry to DeFoor on

April 29, 2012.  In response to the question of whether the faculty member was making appropriate progress towards tenure and/or promotion, Looper stated: "N/A Mr. Terry should have completed his Ph.D. in order to move to tenure track.  The hope was that he would finish his degree by December 2011.  Joe has told his dept. chair that he plans to defend it in May."  (*Id.* at ¶ 174.)

Because Looper was concerned about renewing Terry's contract and Hallett was still undecided, they told DeFoor and Roach that they wanted to meet with Terry before making a final decision on his contract renewal.  (*Id.* at ¶ 175.)  When Looper and Hallett met with Terry on May 2, 2012, their main goal was to try to talk with Terry about how to communicate successfully at YHC without being disrespectful and insubordinate and how to be an effective member of the team.  (*Id.* at ¶ 176.)  Hallett offered to tape the meeting.  Terry said that was not necessary and then secretly taped it himself.  (*Id.* at ¶ 177.)

At the meeting, both Looper and Hallett specifically told Terry that it was not the fact that he disagreed with Roach about the Media Policy that was the issue they wanted to discuss with him but rather the inappropriate and disrespectful language he had used in disagreeing with him.  (*Id.* at ¶ 178.)  Looper talked to Terry about a campus culture that values respectful, decorous communications and told him that he was not doing himself a service, helping the department, or helping the division by

being disrespectful.  (*Id.* at ¶ 179.)  Looper asked Terry to think about the impact of his language because he had used very vehement language and told him that there may be institutions where it was acceptable to refer to a colleague as astonishingly unethical, but YHC was not one of them.  (*Id.* at ¶ 181.)  Hallett found that Terry was unable to move past their disagreement over the Media Policy and would not talk about the communications issues that were hindering his ability to be a productive member of the department.  (*Id.* at ¶ 180.)

Looper stated at the meeting that Terry would be issued a Corrective Action for insubordination and discussed with him what he could do to "move ahead."  (Pls.' Resp. to Def.'s Undisputed Facts ¶182.)  Terry stated that he was happy with Hallett as his department chair but that he was disappointed about the Corrective Action because he believes disagreement is healthy, especially in an academic environment. (*Id.*)  Looper indicated that they would have another conversation with Terry in the future about the timing for the completion of his Ph.D.  (*Id.*)  Looper stated that "[i]n a lot of ways we've accomplished what I hoped to accomplish . . . to make sure . . . to minimize damage."  (*Id.*)  Looper, who had hoped Terry would see that his communication was way out of line, saw at the meeting that Terry demonized others who did not agree with him and showed no sign of regret about the things he had written.  (Def.'s Undisputed Facts ¶182.)

That same evening, Looper and Hallett again met with DeFoor, Roach, and Robelotto to finalize the decision on whether to renew Terry's contract. (*Id.* at ¶ 183.) Cox had sent an email to the group saying that she opposed the renewal of Terry's contract but that she would abide by whatever decision they made. (*Id.* at ¶ 184.) After discussing Looper and Hallett's meeting with Terry, Looper and DeFoor asked Hallett to make the first recommendation with regard to Terry's renewal because she was his department chair and because they did not want to influence her decision. (*Id.* at ¶ 185.) Hallett recommended that Terry's contract not be renewed, and Looper and DeFoor immediately concurred. (*Id.* at ¶ 186.) In an email to Roach dated May 15, 2012, Hallett stated, "[d]espite the other activity that would have promoted a corrective action, we would not have been discussing non-renewal for Joe if it hadn't been for the degree completion issue." (*Id.* at ¶ 187.)

In their first meeting regarding Terry on May 1, 2012, Roach, DeFoor, Looper, and Hallett also discussed Crapanzano's attendance at commencement. They decided that because a student who belonged to Gamma Psi sorority was receiving a high-level award, they did not want to risk Crapanzano's causing any kind of disruption and recommended that she not be permitted to attend. (*Id.* at ¶ 188.) On May 2, 2012, Roach and Looper requested a meeting with Crapanzano to discuss her refusal to follow the Media Policy, but Crapanzano refused to meet with them unless they

provided her with an agenda.  (*Id.* at ¶ 189.)  On May 3, 2012, Robelotto sent a letter to Crapanzano stating that as of that date, her one-year appointment as visiting instructor at YHC had ended and her services were no longer required at YHC.  (*Id.* at ¶ 190.)  Robelotto also wrote that, as stated in her appointment letter of June 20, 2011, Crapanzano would be paid the balance of her salary through July 31, 2012, provided she turned in all final grades as required by YHC.  (*Id.* at ¶ 191.)  In addition, Robelotto informed Crapanzano that she was not to attend any graduation activities occurring from May 3 to May 5, 2012.  (*Id.* at ¶ 192.)

On May 7, 2012, Roach sent a letter to Terry stating in pertinent part: "In view of the fact that after two full years you have yet to complete the terminal degree required for the appointment, the college has decided not to renew your appointment for academic year 2012-2013."  (*Id.* at ¶ 197.)  Roach's letter further stated that, as set forth in Terry's appointment letter, he was an "employee-at-will" and his employment contract was subject to termination by either party to the contract at any time during its term.  (*Id.* at ¶ 198.)

On May 15, 2012, Terry wrote to Cox, saying, in pertinent part:  "I want to send you a personal note, as I've just learned that I've essentially been fired by Dr. Ron Roach for the email exchange concerning the Enotah Echoes publication policy, to which you were a party."  (*Id.* at ¶ 199.)  In his letter, Terry claims that he excelled in

the classroom and in his service to YHC and that "[t]here is ample evidence that this dismissal is Ron Roach carrying out a personal vendetta." (*Id.* at ¶ 200.) Cox replied to Terry's letter on May 18, 2012, stating, among other things: "[T]he College has put the tenure clock on hold and given you two full academic years to complete your Ph.D. so you could move back onto the College's tenure track. You failed to meet any of the deadlines. In view of this, the Department Chair, Division Dean, and Associate Vice President for Academic Affairs, and the Vice President for Academic Affairs, in consultation with the Human Resources Director, deliberated and rendered this decision. . . . I concurred with their recommendation." (*Id.* at ¶ 202.)

Terry's teaching evaluations for academic years 2010-2011 and 2011-2012 include comparisons of his ratings with all other faculty in the humanities division and at YHC at large. Of 144 student ratings spanning 16 courses, 17 ratings were equal to those of other professors, 48 were higher and 79 were lower, which demonstrates that more than half the time, Terry was rated lower than other faculty members during the same semesters and only one-third of the time was rated higher. (*Id.* at ¶ 203.)

On May 15, 2012, Roach emailed Hallett and Looper telling them that Terry was accusing him of making a unilateral decision with regard to Terry's non-renewal and carrying out a personal vendetta against Terry. (*Id.* at ¶ 204.) Roach's email states: "As both of you know, nothing could be further from the truth. I repeatedly

point out that, because I was one of the targets of his attack, I would not take the lead in determining the proper course of action in his case. . . . He also maintains that he has told everyone in his department for months that he will not graduate until August[, 2012]. My clear understanding in December, and Jen's in January, was that he would finish by May[, 2012]. The first time I ever heard the August date mentioned was when Keith pointed it out on Joe's self-evaluation in late April." (Dep. of Terry Ex. 52.)

On March 26, 2013, plaintiffs Burch, Terry, and Crapanzano filed their complaint pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX") and O.C.G.A. § 15-1-2. Burch alleged that she was subjected to hazing and that defendant YHC was grossly negligent and recklessly indifferent in response to a widespread and well-known culture of abusive and sexually charged hazing among fraternities and sororities operating on the YHC campus. Plaintiffs alleged that defendant's indifference was the proximate cause of severe sex-based harassment, assault, battery, and intentional infliction of emotional distress upon Burch. Plaintiffs also alleged that defendant retaliated against Crapanzano and Terry, who were instructors at YHC, for being instrumental in bringing the culture of hazing to the forefront and for advocating on behalf of Burch and other students who were the victims of the hazing culture.

On October 9, 2013, the court entered an order dismissing Burch's claims because she had failed to state a claim for sexual harassment that is cognizable under Title IX.  The court found that while the hazing activities to which Burch alleged that she was subjected may be viewed as abusive, they do not constitute sexual harassment.  The court also declined to exercise supplemental jurisdiction over Burch's state law claims pursuant to 28 U.S.C. § 1367(c)(4).  The court found, however, that Crapanzano and Terry had sufficiently stated claims for retaliation under Title IX to survive the motion to dismiss.  The court expressly noted plaintiffs' allegations in the complaint that in an investigation Crapanzano had conducted, she had uncovered hazing that was sexually degrading in nature and that both Crapanzano and Terry asserted they had engaged in conduct that made YHC aware of such hazing.

## II.    Legal Analysis

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

It is well settled that a court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. *See, e.g.*, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986), *reh'g denied*, 815 F.2d 66 (11th Cir. 1987). To survive a motion for summary judgment, the non-moving party need only present evidence from which the trier of fact might return a verdict in his favor. *Samples*, 846 F.2d at 1330. However, Rule 56, "[b]y its very terms, . . . provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The materiality of facts is governed by the relevant substantive law in the case. *Id.* at 248. A dispute is genuine if the evidence is such that the factual issues "may reasonably be resolved in favor of either party." *Id.* at 250.

Consideration of a summary judgment motion does not lessen the burden on the non-moving party. The non-moving party still bears the burden of coming forth with sufficient evidence. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). "If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be

granted." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (citation omitted).

The Supreme Court explicitly recognized that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 172-73 (2005). To state a claim of retaliation under Title IX, plaintiffs must show that they engaged in protected activity, that they suffered an adverse employment action, and that there was a causal link between the two. *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1359-60 (M.D. Ga. 2007). Defendant asserts that plaintiffs Crapanzano and Terry must be dismissed because they cannot establish the elements of a *prima facie* case of retaliation under Title IX.

In support of their claim, Crapanzano and Terry allege that they were terminated for opposing hazing at YHC. The fact that Crapanzano and Terry did not personally witness or experience the hazing is not critical so long as they had a good faith belief that sexually degrading conduct occurred during the alleged hazing. *See Jackson*, 544 U.S. at 179 (holding that Title IX "does not require that the victim of retaliation must also be the victim of the discrimination that is the subject of the original complaint"). As explained in its previous order, however, Title IX does not

prohibit hazing.  It prohibits sexual harassment.  "To prevail on the merits, [plaintiffs must] prove that [defendant] retaliated against [them] because [they] complained of sex discrimination."  *Jackson*, 544 U.S. at 184 (holding that a Title IX retaliation claim is sufficiently alleged when a basketball coach was demoted after he complained to his supervisors about unequal treatment of female athletes).  In addition, the fact that Burch's claims were dismissed for failure to state a claim for sexual harassment that was cognizable under Title IX is not determinative.  A retaliation claim does not depend on the success of the underlying harassment claim.  The Eleventh Circuit has held that the analogous anti-retaliation provision under Title VII "shields an employee from retaliation regardless of the merit of her complaints so long as she can show a good faith, reasonable belief that the challenged practices violate Title VII."  *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).

To establish the first element of their retaliation claim, plaintiffs contend that they did not complain about merely some form of non-sexist, non-sexually degrading hazing ritual.  Plaintiffs' complaint specifically listed the following sexually degrading hazing practices that Crapanzano allegedly uncovered from her investigation:

- Forcing female pledges to take part in a "panty run," in which they are required to run across campus in their underwear as other students, including male students, look on;

- Forcing "sweethearts" (female members of male fraternities) to stand naked and be judged by the fraternity members;
- Forcing "sweethearts" to hump the ground and moan as if having sex, as the fraternity members look on;
- Forcing both female and male pledges to stand in a pool of water in which the older pledges have urinated or defecated;
- Forcing male pledges to engage in "elephant crawls" through a creek, during which the pledges crawl one behind another, with each pledge's face planted between the buttocks of the pledge in front of him;
- Forcing female pledges to sit unclothed on running washing machines while members of the sorority use a permanent marker to mark areas of their bodies that jiggle;
- Interrogating students who are believed to have "ratted" on fellow Greeks and making derogatory and sexually explicit personal insults.  In one particular instance during the spring semester, a female student was screamed at to the point of tears in front of an entire sorority and called sex-specific insults such as "cunt" and "whore."

(Compl. ¶ 30.)

Defendant points out, however, that Crapanzano and Terry never informed any member of the YHC's administration of these sexually degrading hazing practices. Cox and Roach declared under penalty of perjury that the first time they saw these allegations was when they read the complaint in this case.  (Statement of Cox ¶ 15; Statement of Roach ¶ 13.)  Moreover, both Crapanzano and Terry testified that they did not inform any member of the YHC's administration of the sexually degrading hazing practices that Crapanzano uncovered from her investigation.   (Dep. of Crapanzano 298-309; Dep. of Terry 254-44.)

37

The faculty forum held on April 17, 2012, was called to discuss hazing on campus and, specifically, YHC's failure to impose penalties on individuals for hazing violations.  (Dep. of Crapanzano 169-171.)  In connection with the faculty forum, Crapanzano circulated a faculty petition requesting that YHC revise its hazing policy to require repercussions for individuals who participate in hazing.[3]  (*Id.* at Ex. 18.) The petition was signed by 36 faculty members, including Hallett and Looper, both of whom oppose hazing.  (Statement of Hallett ¶ 24; Statement of Looper ¶¶ 11, 14.) As requested by Goldsmith, no administration or staff members of YHC attended the faculty forum.[4]  (Def.'s Undisputed Facts ¶ 89.)  In addition, the petition circulated and signed in connection with the faculty forum was never provided to YHC's administration.[5]  (*Id.* at ¶ 92.)  The specific content of the discussion that took place at the faculty forum is disputed.  While defendant argues that the discussion centered

---

[3] Plaintiffs do not allege that the petition contains any reference to hazing that involved sexual discrimination or sexual harassment.  The petition, as submitted by plaintiffs, does not make any mention of hazing involving sexual harassment or discrimination.

[4] Faculty members who have certain administrative duties are still classified as faculty and paid as faculty, with a separate stipend added on for administrative work.  (Def.'s Undisputed Facts ¶ 99.)  Faculty members are not part of the management of YHC and do not have the authority to hire, fire, or establish or enforce YHC policy.  (*Id.* at ¶ 100.)

[5] Plaintiffs refer to the statement of Goldsmith in which Goldsmith states that she left a copy of the petition in two open mailboxes:  Student Affairs and Academic Affairs.  (Statement of Goldsmith ¶ 14.)  Goldsmith does not assert that they were addressed to anyone in particular.  This does not establish that Goldsmith provided the petition to the administration.  Moreover, plaintiffs admit that the petition was never provided to YHC's administration.  (Def.'s Undisputed Facts ¶ 92.)

on hazing and individual liability for hazing, plaintiffs argue that the discussion heavily centered on the sexual nature of the hazing.  As defendant points out, this dispute is immaterial because the hazing discussed at the faculty forum was never reported to YHC's administration.

Plaintiffs then argue that during the faculty meeting held on April 25, 2012, the discussion of hazing included sexually harassing behavior and that plaintiffs and other faculty believed that the hazing involved sexually harassing conduct.  Plaintiffs' argument is not supported by the record before the court.  Plaintiffs have not submitted any evidence, other than their conclusory statements, that any of the discussion explicitly involved the sexually harassing nature of the hazing at issue.  (*Id.* at ¶110.)  The record indicates that the argument between Crapanzano and Cox centered on Crapanzano's objections to YHC's lack of an adequate response to Burch's hazing. (Faculty Meeting Excerpt.) The undisputed facts support defendant's contention that it was not notified of sexual harassment or sexual discrimination. Crapanzano and Terry complained about hazing, not sexual harassment.  For their conduct to be protected activity, Crapanzano and Terry had to complain about sex harassment or discrimination to someone who had the ability to stop it.  They therefore did not engage in any activity that Title IX protects from retaliation.

With respect to plaintiffs' claim that defendant retaliated against plaintiffs by attempting to censor an article about hazing in the student newspaper, plaintiffs have failed to establish that such censorship occurred.  The undisputed facts show that the faculty members involved attempted to follow the procedures provided in Standard Three of the Media Policy, which Crapanzano and Terry drafted.  The undisputed facts show that YHC was concerned about the potential liability that the article might create not only for YHC but also for the faculty and students.  As set forth in detail above, on numerous occasions between April 18 and April 27, 2012, Crapanzano refused the continuing requests of her department chair, Hallett, to provide the article relating to hazing to Doniger for her legal review and the requests of her dean, Looper, for copies of the article.  There is no evidence that any of the events relating to the hazing article, which was never shown to anyone, or the suspension of the student newspaper had anything to do with Crapanzano's or Terry's opposition to hazing involving sex harassment or discrimination.

Even if plaintiffs had established that they engaged in protected activity, they cannot show that any adverse employment action is related to their activity. Moreover, and as shown at length above, defendant has proffered legitimate non-discriminatory reasons for its employment actions regarding Crapanzano and Terry. Plaintiffs' contention that Terry's employment contract was not renewed because he

opposed hazing is not supported by the record.  As set forth in detail above, the undisputed facts show that Terry's employment contract was not renewed because he had not obtained his Ph.D. within two academic years after he began working for YHC.  In an email to Roach dated May 15, 2012, Hallett stated, "[d]espite the other activity that would have promoted a corrective action, we would not have been discussing non-renewal for [Terry] if it hadn't been for the degree completion issue." (Def.'s Undisputed Facts ¶ 187.)

As plaintiffs point out, Terry's reappointment letter stated that he would be notified by December 15, 2011, if his employment contract was not going to be renewed.  Defendant explains that Terry was not so notified because his contract had been modified in November 2011 at his request to provide a May 2012 date for his receipt of his Ph.D.  Rather than notifying Terry by the December 15 date set forth in his reappointment letter that his contract would be terminated for failure to obtain his Ph.D. by December 1, 2011, YHC decided to modify its agreement with Terry by accepting his new May 2012 graduation date.  (Statement of Roach ¶ 5; Statement of Cox ¶ 5.)  Contrary to plaintiffs' allegation, Bowman, Marinelli, and Ashley Carr, instructors at YHC who had not received their Ph.D.'s at the beginning of their employment at YHC, have not been terminated because they received their terminal degrees within a two-year period.  (Dep. of Cox 61; Statement of Robelotto Attach A.)

41

Furthermore, it is not disputed that Terry was an employee-at-will under his contract and could be terminated at any time for any reason.

Moreover, Roach's email to Crapanzano dealt with her refusal to follow the Media Policy and not with her reporting of any sex-related hazing, and Terry's response to that email related solely to the interpretation of that policy.  Thus, even if Terry's contract were not renewed because of his response to Roach, that response was unrelated to any reporting by Crapanzano or Terry of hazing involving sex harassment or sex discrimination.  Accordingly, the non-renewal of Terry's contract cannot constitute retaliation in violation of Title IX.

Crapanzano claims that she was retaliated against by being banned from graduation and having her computer access cut off four days before the end of the spring semester, which made it difficult for her to submit her grades.  She also claims that Cox threatened her with physical violence at the faculty meeting on April 25, 2012.  In addition, she asserts that Hallett subjected her to a "hostile work environment" by "interfering with [her] classes, general passive aggressiveness," and by "all the actions taken with regards to the issues involving hazing at the end of the year."  (Dep. of Crapanzano 16, 45-54.)

As set forth above, even if Crapanzano was threatened at the faculty meeting held on April 25, 2012, the certified transcript of the recording she made and provided

to defendant indicates that there was no discussion of sex-related hazing at the meeting. Plaintiffs cannot establish that the alleged threat was caused by plaintiffs' engaging in protected activity under Title IX. In addition, Crapanzano does not allege that Hallett's conduct was in any way related to any claims Crapanzano made regarding sex harassment or discrimination involving hazing. In fact, as set forth above, Crapanzano's conduct towards Hallett was insubordinate on several occasions, including one instance in which she refused to submit an article to Hallett pursuant to the Media Policy that had no relation to hazing.

The undisputed facts show that defendant's decision to ban Crapanzano from the commencement events was based on its concern that Crapanzano might cause a disruption because a student, who belonged to the sorority involved in Burch's hazing incident, was getting a high-level award. (Statement of Looper ¶ 30; Dep. of Roach 51-52.) Defendant explains that this concern was predicated on Crapanzano's behavior at the faculty meeting and her conduct at the honors ceremony on April 22, 2012. Several faculty members and administrators considered Crapanzano's comments at the honors ceremony inaccurate and inappropriate.[6] (Dep. of Hallett 47;

---

[6] With regard to the honors ceremony, Hallett stated: "So we were at a celebration of dozens of students and she took the time to change the tone of it to one of insult to the administration for perceived wrongs that these students had suffered." (Dep. of Hallett 47.)

Dep. of Cox 41; Dep. of Roach 51.)  Terry, who stated that he was equally opposed to hazing, was not barred from attending graduation.

Despite her claims of difficulty in submitting her grades, Crapanzano submitted them by May 6, 2012.  (Statement of Gibson ¶ 3.)  The spring semester ended with the submission of grades due on May 7, 2012.  Crapanzano taught two classes during the spring semester of 2012 in addition to her newspaper classes, which had no exams. In both classes, a paper was due during the final exam period, which was to be eight to ten pages long and was due in hard copy on May 2, 2012.  In one class, there was also a take-home exam that was due on April 25, 2012.  (Def.'s Undisputed Facts ¶ 196.)  Before her computer access was cut off on the day she received Robelotto's letter, Crapanzano had already wiped her computer of all data, even though the Handbook states that everything on YHC's computers belongs to YHC.  (*Id.* at ¶ 194.) Although Crapanzano was employed for an academic year, she was paid her salary and benefits through July 31, 2012, a choice many faculty made.  Crapanzano experienced no financial harm as a result of being excluded from graduation ceremonies and from having her computer access terminated four days prior to the end of the semester.

With regard to Crapanzano's assertion that a campus police officer's being present when she cleaned out her office was retaliatory, there is no evidence that the

officer was rude or disrespectful, that the officer was present for any reason other than to ensure that Crapanzano had not retained any property belonging to YHC, including keys, or that the officer's presence was anything other than standard procedure. Defendant points out that Crapanzano cleaned out her office on May 6, 2012, which was a Sunday, when very few faculty and staff were on campus. Crapanzano even states that she submitted her final grades "with the help of the officer." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 14.)

## III.    Conclusion

For the foregoing reasons, the court hereby **GRANTS** defendant's motion for summary judgment [55]. The clerk is hereby **DIRECTED** to **ENTER** judgment for defendant and against plaintiffs.

**IT IS SO ORDERED**, this 17th day of February, 2015.


s/*William C. O'Kelley*
WILLIAM C. O'KELLEY
Senior United States District Judge